[Cite as *State v. Spivey*, 2014-Ohio-721.]

STATE OF OHIO, MAHONING COUNTY

IN THE COURT OF APPEALS

SEVENTH DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO, | ) | |
| | ) | CASE NO.    12 MA 75 |
| RESPONDENT-APPELLEE, | ) | |
| | ) | |
| VS. | ) | O P I N I O N |
| | ) | |
| WARREN SPIVEY, | ) | |
| | ) | |
| PETITIONER-APPELLANT. | ) | |

CHARACTER OF PROCEEDINGS:        Criminal Appeal from Common Pleas
                                 Court, Case No. 89CR20.

JUDGMENT:                        Affirmed.

APPEARANCES:
For Plaintiff-Appellee:          Attorney Paul Gains
                                 Prosecuting Attorney
                                 Attorney Ralph Rivera
                                 Assistant Prosecuting Attorney
                                 21 West Boardman Street, 6th Floor
                                 Youngstown, Ohio  44503

For Defendant-Appellant:         Attorney John Juhasz
                                 7081 West Boulevard, Suite 4
                                 Youngstown, Ohio  44512

JUDGES:
Hon. Joseph J. Vukovich
Hon. Cheryl L. Waite
Hon. Mary DeGenaro

                                 Dated:  February 21, 2014

VUKOVICH, J.

**{¶1}** Petitioner-appellant Warren Spivey appeals from the decision of the Mahoning County Court of Common Pleas denying his December 20, 2002 petition for postconviction relief. The issue in this appeal is whether the trial court abused its discretion when it found that Spivey did not present evidence of intellectual impairment that would classify him as "mentally retarded."[1] Spivey seeks a finding that he is "mentally retarded" so that his death sentence can be reversed and a life sentence can instead be imposed. For the reasons expressed below, the trial court did not abuse its discretion when it denied Spivey's petition for postconviction relief. The judgment of the trial court is hereby affirmed.

Statement of the Case

**{¶2}** On January 18, 1989, Spivey was indicted, among other charges, for the aggravated murder of Veda Vesper, who was found murdered in Youngstown, Ohio on January 3, 1989. Originally Spivey pled not guilty; however, on October 11, 1989, he entered a no contest plea to the charges. Following the plea's entrance, a three judge panel found him guilty of all charges. A mitigation hearing was held on November 13, 1989. One week later, the three judge panel imposed the death sentence. 11/20/1989.

**{¶3}** A timely notice of appeal was filed from that decision and the conviction and sentence were thereafter affirmed by this court. *State v. Spivey*, 7th Dist. No. 89CA172, 1997 WL 16196 (Jan. 13, 1997). Spivey appealed that decision to the Ohio Supreme Court, which also affirmed the conviction and sentence. *State v. Spivey*, 81 Ohio St.3d 405, 692 N.E.2d 151 (1998).

**{¶4}** On March 31, 1997, while the appeal of his 1989 conviction and sentence was pending in the Ohio Supreme Court, Spivey filed a timely application to reopen his appeal. We denied the motion. *State v. Spivey*, 7th Dist. No. 89CA172, 1998 WL 78656 (Feb. 11, 1998). Spivey appealed that decision to the Ohio

---

[1] We recognize that the term "mentally retarded" is not technically correct. However, it is the term that is used by the Ohio Supreme Court in *Lott* and the United States Supreme Court in *Atkins,* both of which are controlling in this case. Furthermore, it is the term used by the trial court. Therefore, despite the insensitivity of the term, we continue to use it for the legal standard set forth in those cases.

Supreme Court, which affirmed our decision. *State v. Spivey*, 84 Ohio St.3d 24, 701 N.E.2d 696 (1998).

{¶5} On September 20, 1996, before we affirmed his conviction and sentence, Spivey filed his first postconviction petition. An evidentiary hearing was held on that petition in 1999. The trial court denied the petition in May 2000. That decision was appealed to our court. In 2002, we affirmed the trial court's decision. *State v. Spivey*, 7th Dist. No. 00CA106, 2002 WL 418373 (Mar. 15, 2002).

{¶6} Two months following the affirmance of the trial court's denial of Spivey's postconviction petition, the United States Supreme Court ruled that the execution of "mentally retarded" criminals violates the Eighth Amendment's ban on cruel and unusual punishment. *Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242 (2002). However, the *Atkins* decision did not establish procedures for determining whether an individual is "mentally retarded" for purposes of escaping execution. Rather, it left that determination to the states; "we leave to the State[s] the task of developing **appropriate** ways to enforce the constitutional restriction upon [their] execution of sentences." *Id.* at 317 quoting *Ford v. Wainwright,* 477 U.S. 399, 405, 416-417, 106 S.Ct. 2595 (1986).

{¶7} Thereafter, the Ohio Supreme Court set forth the standards to be employed in Ohio. *State v. Lott*, 97 Ohio St.3d 303, 2002-Ohio-6625, 779 N.E.2d 1011. In rendering that decision, the Court explained that the procedures for postconviction relief as set forth in "R.C. 2953.21 et seq. provide a suitable statutory framework for reviewing" an *Atkins* claim. *Id.* at ¶ 13. R.C. 2953.23(A) specifically indicates that a court may not entertain a successive petition unless one of the two exceptions apply. *Id.* at ¶ 14. The Court found that the exception enumerated in subsection (b) was applicable. *Id.* at ¶ 17. That subsection states a successive petition can be entertained if the "United States Supreme Court has recognized a new federal or state right that applies retroactively to persons in the petitioner's situation, and the petition asserts a claim based on that right." R.C. 2953.23(A)(1)(b); *Id.* at ¶ 16.

{¶8} Following that reasoning, the Court explained:

For all other defendants who have been sentenced to death, any petition for postconviction relief specifically raising an *Atkins* claim must be filed within 180 days from the date of the judgment in this case. Petitions filed more than 180 days after this decision must meet the statutory standards for untimely and successive petitions for postconviction relief.

*Id.* at ¶ 24.

{¶9} On December 20, 2002, Spivey filed a successive petition for postconviction relief asserting an *Atkins* claim. Based on the advisements in *Lott*, this petition was timely and could be entertained.

{¶10} Spivey then filed a Motion for Jury Determination of Mental Retardation and for Rejection of Presumption of the IQ Level of 70 to Determine Mental Retardation, which was denied. 09/22/04 Motion; 04/05/05 J.E.

{¶11} In 2004, Spivey was evaluated by Dr. Jeffrey Smalldon to determine if he was "mentally retarded." Dr. Smalldon determined that Spivey is not "mentally retarded" as defined by either the Diagnostic and Statistical Manual of Mental Disorders-IV-Text Revision or the American Associated of Mental Retardation's Mental Retardation Manual.

{¶12} In 2008, Spivey asked for a competency determination and requested a stay of the proceedings. The trial court granted the stay for purposes of allowing Spivey to be evaluated by Dr. Thomas Gazley from the Forensic Center of Northeast Ohio. Dr. Gazley determined that Spivey was competent to participate in the postconviction proceedings.

{¶13} The trial court then ordered Dr. Gazley to evaluate Spivey for purposes of determining if he is "mentally retarded" under *Atkins* and *Lott*. Dr. Gazley rendered the opinion that Spivey is not "mentally retarded."

{¶14} An evidentiary hearing on whether Spivey met the definition of "mental retardation" as set forth in *Atkins* and *Lott* was held on April 28, 2011 and June 14, 2011.

{¶15} In March of 2012 the trial court denied the successive postconviction petition. 03/19/12 J.E. In doing so, it concluded:

6. Clinical definitions of mental retardation, cited with approval in *Atkins*, provide a standard for evaluating an individual's claim of mental retardation. *State v. Lott*, at 307. Citing definitions from the American Association of Mental Retardation and the American Psychiatric Association, the standard requires (1) significantly sub-average intellectual functions, (2) significant limitations in two or more adaptive skills, such as communication, self-care and self-direction, and (3) onset before the age of 18.

7. In the instant case there is evidence that the Defendant had limitations in some adaptive skills, such as self-care and self-direction and those limitations were present before the age of 18.

8. There is no evidence that the Defendant had significantly sub-average intellectual functioning.

9. According to Dr. Thomas Gazley, the Defendant could never qualify for a diagnosis of mental retardation, based on the Defendant's IQ scores of 84 and 87.

10. This Court finds that the Defendant did not establish that the Defendant is mentally retarded.

03/19/12 J.E

**{¶16}** Spivey timely appeals from that decision.

First Assignment of Error

**{¶17}** "The trial court erred in finding that Spivey's *Atkins* claim was not proved by a preponderance of the evidence."

**{¶18}** In *Lott*, the Ohio Supreme Court explained that in order to be entitled to relief, the petitioner must prove by a preponderance of the evidence that he is "mentally retarded" as defined by *Atkins* and *Lott*. *Lott* at ¶ 17. In reviewing the trial court's decision as to whether that standard was met, we employ an abuse of discretion standard of review. *State v. Gondor,* 112 Ohio St.3d 377, 2006–Ohio–6679, 860 N.E.2d 77, ¶ 58. A trial court abuses its discretion when its judgment is unreasonable, arbitrary, or unconscionable. *State v. Adams,* 62 Ohio St.2d 151, 157, 404 N.E .2d 144 (1980).

{¶19} As aforementioned in *Atkins*, the United States Supreme Court determined that it was unconstitutional to execute a "mentally retarded" individual. In *Lott*, the Ohio Supreme Court set forth the standards and guidelines to be used in Ohio to determine mental retardation:

In the absence of a statutory framework to determine mental retardation, Ohio courts should observe the following substantive standards and procedural guidelines in determining whether convicted defendants facing the death penalty are mentally retarded. * * *

Clinical definitions of mental retardation, cited with approval in *Atkins,* provide a standard for evaluating an individual's claim of mental retardation. *Id.* at fn. 3, citing definitions from the American Association of Mental Retardation and the American Psychiatric Association. These definitions require (1) significantly sub-average intellectual functioning, (2) significant limitations in two or more adaptive skills, such as communication, self-care, and self-direction, and (3) onset before the age of 18. Most state statutes prohibiting the execution of the mentally retarded require evidence that the individual has an IQ of 70 or below. *See* Ky.Rev.Stat. 532.130 and 532.140; Neb.Rev.Stat. 28-105.01(2); N.M.Stat. 31-20A-2.1; N.C.Stat. 15A-2005; S.D. Codified Laws 23A-27A-26.2; Tenn.Code 39-13-203(b); and Wash.Rev.Code 10.95.030(2). While IQ tests are one of the many factors that need to be considered, they alone are not sufficient to make a final determination on this issue. *Murphy v. State,* 54 P.3d at 568, 2002 OK CR 32, at ¶ 29. We hold that there is a rebuttable presumption that a defendant is not mentally retarded if his or her IQ is above 70.

*Lott* at ¶ 11-12.

{¶20} In this case, there are reports from two different doctors as to whether Spivey qualifies for a diagnosis of "mental retardation" under the *Lott* decision. The first doctor, Dr. Smalldon, concluded in 2004 that Spivey would not qualify for a "mental retardation" diagnosis. Dr. Smalldon indicated that Spivey's full scale IQ on

the Wechsler Adult Intelligence Scale – Third Edition, was 82, which falls within the range that is typically referred to as "low average."  He further concluded:

> [A]lthough [Spivey] has a long history of learning/behavioral problems, as well as some striking cognitive limitations, he is <u>not</u> mentally retarded as that term is defined in either the <u>Diagnostic and Statistical Manual of Mental Disorders-IV-Test Revision</u> (DSM-IV-TR) <u>or</u> the American Association of Mental Retardation's Mental Retardation Manual.
>
> His IQ scores are simply too high.  * * * Although it's possible, for a variety of different reasons, for a test subject to obtain IQ estimates that underestimate his/her actual intellectual potential, it's not possible – at least under any scenario that I can imagine – for him/her to obtain scores that overestimate his/her intellectual capabilities.

Dr. Smalldon Report pgs. 15-16.

**{¶21}** Dr. Gazley's testing and diagnosis that occurred in September 2010 reached a similar conclusion.  Dr. Gazley administered two IQ tests; Spivey's full scale IQ results were 84 and 87.  He indicated that these scores are "well beyond the range which would be considered necessary for a diagnosis of mental retardation or developmental disability."  Dr. Gazley *Atkins/Lott* Report pg. 8.  Akin to Dr. Smalldon's opinion, Dr. Gazley also indicated that the scores on the IQ test are too high to support a diagnosis of "mental retardation."  Dr. Gazley *Atkins/Lott* Report pg. 9.

**{¶22}** The results of the IQ tests administered by Drs. Smalldon and Gazley were consistent with previous IQ determinations that were administered on Spivey when he was younger.  At the death penalty mitigation hearing in 1989, Mary Stewart, who was Spivey's probation officer, testified that Spivey's mental intelligence was borderline.  Mitigation Hrg. Tr. 936.  Dr. Eisenberg testified that Spivey's full scale IQ result was 74, which placed him in the borderline range of intelligence.  Mitigation Hrg. Tr. 1072-1073; 1163-1164.  He further explained that the highest Spivey ever scored was 89 and the lowest he scored was in the high 50s.  Mitigation Hrg. Tr. 1073.  Dr. Eisenberg's ultimate opinion was that in 1989, when Spivey was

20 years old, he was functioning like a ten year old.  Mitigation Hrg. Tr. 1073.  There is no indication in any of the evidence that was submitted at the mitigation hearing that Spivey was ever diagnosed as being "mentally retarded."

{¶23} The IQ scores establish a presumption that Spivey is not "mentally retarded" as defined by *Lott*.  That said, it is acknowledged that the record is replete with evidence that Spivey has had cognitive limitations during his entire life.  Dr. Smalldon explained:

> Despite the fact that Mr. Spivey's IQ estimates do not fall within the range that is usually associated with mental retardation, still certain of his responses speak clearly to his cognitive limitations, for example his limited fund of general information, his poor skills at abstract concept formation, and his relatively impoverished vocabulary.

Dr. Smalldon Report pg. 12.

{¶24} There was testimony at the mitigation hearing and at the *Atkins/Lott* hearing that Spivey started having convulsions/seizures when he was one and that continued through his teenage years.  He was in and out of hospitals because of this.  There was also testimony from his mother and family members that intellectually he developed more slowly than other kids, that he had learning problems, and that he went to a school for children with learning and behavioral problems.  He was described as "childlike" by one cousin.  It was also stated that his hygiene skills were not good, he could not keep a job, that he could not make change (in fact they would not send him to the store because he would not come back with change and would not get everything he was told to get), and although he was given chores, he would not always complete them.  All of this testimony discussed behaviors prior to the age of 18.

{¶25} The testimony from his mother, family members, and the above statement from Dr. Smalldon tends to show limitations in adaptive skills, such as communication, self-care, and self-direction that were apparent before the age of 18.  These limitations, however, may not be classified as significant, as is required by *Lott* to meet the definition of "mentally retarded."  For instance, the testimony from the family members concerning hygiene was that he would wear the same pants over

and over again. Having a favorite pair of pants is not a hygiene issue and it was explained that he would change the pants when he was instructed to do so. Furthermore, Dr. Gazley offered the opinion that although adaptive skills could not be tested in the death row prison setting, that Spivey probably did not have significant limitations in his adaptive skills. He explained that in meeting with Spivey, he showed an interest in current events, utilized humor, demonstrated an ability to maintain focus and concentration on task, and showed an ability to read. Dr. Gazley *Atkins/Lott* Report pg. 9.

{¶26} Regardless, even if the above testimony did amount to significant limitations of adaptive skills, the problem is that even with that testimony the trial court's conclusion that Spivey could not overcome the presumption that he was not "mentally retarded" because of his IQ scores was not an abuse of discretion. As aforementioned, both Dr. Smalldon and Dr. Gazley concluded that Spivey's IQ scores were simply too high to ever qualify for a "mentally retarded" diagnosis. Dr. Gazley explained this best during his testimony at the *Atkins/Lott* hearing. He stated that there is no specific number beyond a score of 70 which automatically disqualified a person from a diagnosis of mental retardation, but as the scores go up, "as defined by the Diagnostic and Statistical Manual, you fall well above what they consider a cutoff." *Atkins/Lott* Hrg. Tr. 172-174. He explained that when a score approaches 80 or is in the 80s, that is a different categorization of intelligence. *Atkins/Lott* Hrg. Tr. 173. He also explained that IQ scores do not typically go up in later life:

> But it seems difficult for me to imagine a person scoring low enough to qualify for a mental retardation diagnosis prior to the age of 18 and then later in life being evaluated and getting scores in the low average range. That seems unlikely because intelligence is such a stable construct given the lack of other, you know, injury, illness, trauma, those kinds of things.

*Atkins/Lott* Hrg. Tr. 177.

{¶27} The conclusion that Spivey's IQ scores are too high to be ever be considered "mentally retarded" as defined by *Lott*, is not inapposite to the language used in *Lott*. It is logical to conclude that at some point a score will be too high to

qualify the person for a mental retardation diagnosis, even though the person may show significant limitations in adaptive skills that were apparent before the age of 18. Doctors are in the best position to make this determination.

**{¶28}** Spivey cites this court to a 2006 First Appellate District case, *State v. Gumm*, to support its position that the evidence submitted at the *Atkins/Lott* hearing overcame the presumption that he was not "mentally retarded" and that the trial court abused its discretion in not granting the postconviction petition. *Gumm*, however, is distinguishable from the case at hand.

**{¶29}** In *Gumm*, the testimony established that before the age of 18 Gumm would use grunts and not words to communicate, that he could not read or write and did not learn to tie his shoes until he was a teenager. *State v. Gumm*, 169 Ohio App.3d 650, 2006-Ohio-6451, 864 N.E.2d 133, ¶ 6 (1st Dist.). There also was testimony from multiple people that Gumm exhibited poor hygiene skills. *Id.* He likewise did not drive and could not keep a job. Based on the poor adaptive skills and the fact that they occurred before 18 years of age, the doctor concluded that even though Gumm scored 70, 71, 73 and 79 on IQ tests, he was "mentally retarded." *Id.* at ¶ 9.

**{¶30}** In the case at hand, there is testimony that Spivey communicated through talking, although he did not begin to talk as early as his siblings. Also, there is evidence that he can read and write minimally. As to the hygiene skills, as discussed above, there is no indication other than continuing to wear the same clothing that as a child he failed to clean himself, would not brush his teeth, or take care of himself. As to driving, while Spivey may not have had a driver's license, we know that he drove a car because the victim's car was stolen and driven to a bar by Spivey. Although there was testimony that Spivey could not keep a job, testimony established that he did work for six months at a corner store. 10/18/99 First Postconviction Relief Hrg. pg. 39. Moreover, the doctor in *Gumm* concluded that Gumm is "mentally retarded." Here, two doctors concluded that Spivey is not "mentally retarded." It is difficult to conclude that the trial court abused its discretion when it agreed with the opinion of two doctors that Spivey's scores were too high to ever qualify him for a "mentally retarded" diagnosis.

**{¶31}** Considering all the above, we cannot find that the trial court's decision was an abuse of discretion. This assignment of error is meritless.

Second Assignment of Error

**{¶32}** "The trial court erred in failing to find that the 70 IQ presumption violates due process."

**{¶33}** In this assignment of error, Spivey admits that the Ohio Supreme Court in *Lott* established a rebuttable presumption that a defendant with an IQ score of over 70 is not "mentally retarded". Spivey acknowledges that the government is allowed to create and apply a presumption if the presumption is rational. Spivey contends that this presumption is not rational and thus, violates due process. Therefore, he asserts that the trial court should have granted his motion that requested it to reject the presumption. The essence of his argument is that the Ohio Supreme Court created an unconstitutional rebuttable presumption in *Lott.*

**{¶34}** As an inferior court, we are bound to follow the Ohio Supreme Court's directives and have no authority to overturn them. *State v. Loyed,* 8th Dist. No. 83075, 2004–Ohio–3961, ¶ 33. Furthermore, "it is unlikely the Ohio Supreme Court would direct inferior courts to violate the constitution." *State v. Gibson*, 10th Dist. No. 06AP-509, 2006-Ohio-6899, ¶ 15 (Appellant raised argument that the Ohio Supreme Court's decision in *State v. Foster*, 109 Ohio St.3d 1, 2006-Ohio-856, 845 N.E.2d 470 violated due process. Appellate court concluded that it had to follow *Foster* because it is an inferior court and it did not believe the Court would direct inferior courts to violate the constitution) citing *State v. Hildreth,* 9th Dist. No. 06CA8879, 2006-Ohio-5058, ¶ 10 (same). *See also State v. Whiteside*, 10th Dist. No. 08AP-602, 2009-Ohio-1893, ¶ 54 (same); *State v. Fuller*, 12th Dist. No. CA2006-11-047, 2008-Ohio-20, ¶ 28 (same). Therefore, we will not address Spivey's argument that the rebuttable presumption is unconstitutional because it violates due process other than to conclude that this court and the trial court are bound by the Ohio Supreme Court's decision in *Lott.*

**{¶35}** For those reasons, we do not find that the trial court erred when it did not reject the rebuttable presumption. This assignment of error lacks merit.

Third Assignment of Error

**{¶36}** "The trial court erred in refusing to require the existence of mental retardation to be determined by a jury."

**{¶37}** The argument presented in this assignment of error has already been addressed and rejected by the Ohio Supreme Court. *Lott* at ¶ 18 ("We believe that these matters should be decided by the court and do not represent a jury question."); *State v. Were*, 118 Ohio St.3d 448, 2008-Ohio-2762, 890 N.E.2d 263. In *Were*, the Court specifically explained:

> *Lott* holds that the decision whether or not a defendant is mentally retarded "should be decided by the court and do[es] not represent a jury question. In this regard, a trial court's ruling on mental retardation should be conducted in a manner comparable to a ruling on competency (i.e., the judge, not the jury, decides the issue)." *Lott,* 97 Ohio St.3d 303, 2002-Ohio-6625, 779 N.E.2d 1011, at ¶ 18. Were invokes *Apprendi v. New Jersey* (2000), 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435; *Ring v. Arizona* (2002), 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556; *Blakely v. Washington* (2004), 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403; and *United States v. Booker* (2005), 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621, in arguing that a jury must determine whether a capital defendant is mentally retarded.
>
> * * *
>
> Based on the *Apprendi* line of cases, Were claims that the determination of whether a capital defendant is mentally retarded was a factor that eliminated the possibility of a death sentence, and thus must be decided by the jury. The fact that a capital defendant is not mentally retarded, however, is not an aggravating circumstance that increases a defendant's punishment. Rather, the failure to find mental retardation simply means that the capital defendant remains eligible to be sentenced to death. Such a finding can affect a sentence only by mitigating it. Other jurisdictions that have considered this argument have reached similar conclusions. *See State v. Grell* (2006), 212 Ariz.

516, 526, 135 P.3d 696 ("*Ring* does not require that a jury find the absence of mental retardation"); *State v. Laney* (2006), 367 S.C. 639, 647–649, 627 S.E.2d 726 (same); *Pruitt v. State* (Ind.2005), 834 N.E.2d 90, 112–113 (same); *Howell v. State* (Tenn.2004), 151 S.W.3d 450, 466–467 (mental retardation not required to be proven by the state nor found by a jury); *Head v. Hill* (2003), 277 Ga. 255, 258, 587 S.E.2d 613 (*Ring* and *Atkins* do not require a jury trial on the issue of mental retardation); *Russell v. State* (Miss.2003), 849 So.2d 95, 148 (*Ring* has no application to *Atkins* determination). We conclude that the trial court, not the jury, determines whether a capital defendant is mentally retarded. Nothing in the *Apprendi* line of cases requires otherwise.

*Were* at ¶ 184-186.

**{¶38}** Therefore, considering that the argument made in this assignment of error has already been rejected by the Ohio Supreme Court and that we are an inferior court that is bound by the pronouncements of the Ohio Supreme Court, we find no merit with the argument. *See State v. Waddy*, 10th Dist. No. 09AP-1197, 2011-Ohio-3154, ¶ 53 (Appellate court bound by *Were's* decision that mental retardation is not jury question); *State v. Lawson*, 12th Dist. No. CA2007-12-116, 2008-Ohio-6066, ¶ 7-9 (same); *State v. Hill*, 177 Ohio App. 3d 171, 187, 2008-Ohio-3509, 894 N.E.2d 108, ¶ 65-69 (11th. Dist.2008) (same). This assignment of error lacks merit.

Fourth Assignment of Error

**{¶39}** "The trial court erred in failing to find Spivey incompetent to participate in the proceedings and stay the proceedings until Spivey is competent."

**{¶40}** Under this assignment of error Spivey formulates the question to be decided as whether the United States and Ohio Constitutions require a "capital postconviction petitioner to be competent in order to meaningfully participate in collateral proceedings?" He then asserts that the trial court erred in failing to find Spivey incompetent and in failing to stay the proceedings until competence was restored.

**{¶41}** The Ohio Supreme Court has held that a competency determination must be made before a capital defendant may waive his right to seek postconviction review of his conviction and sentence. *State v. Berry*, 80 Ohio St.3d 371, 382-383, 696 N.E.2d 1097 (1997). Or, in other words, a capital defendant must be deemed competent before he can forego further legal proceedings and submit to his execution. *Id.* This rule of law however has not been extended to require a determination as to whether a capital defendant who chooses to seek postconviction review is competent to proceed. Previously, we have held that a trial court does not abuse its discretion when it does not grant a capital defendant a competency evaluation to determine if the capital defendant is competent to assist in the postconviction proceedings. *State v. Eley*, 7th Dist. No. 99CA109, 2001 WL 1497095 (Nov. 6, 2001). *See also State v. Cassano*, 5th Dist. 12CA55, 2013-Ohio-1783, ¶ 39-42. We explained:

> In a post-conviction relief proceeding, the petitioner's life is at stake. Thus, it is tempting for this court to grant Eley the requested competency hearing considering the nature of this case. However, we must exercise judicial restraint and acknowledge that a petitioner receives no more rights than those granted by the statute. *State v. Calhoun,* (1999), 86 Ohio St.3d 279.
>
> Consequently, we cannot find that a post-conviction proceeding should be treated as a quasi-criminal proceeding where the petitioner must be competent to participate. Inasmuch as the post-conviction statute does not provide for a competency hearing at this stage, and guided by *Berry,* we conclude the trial court did not abuse its discretion by refusing a competency hearing. We specifically hold a capital defendant is neither statutorily nor constitutionally entitled to a competency hearing as a part of his or her post-conviction proceedings.

*Id.*

**{¶42}** Appellant has not persuaded us that the reasoning and conclusions of the foregoing cases are flawed and we decline to overrule our prior precedent. Accordingly, other than a competency hearing to ensure that a capital defendant is

competent to make the decision to forego postconviction proceedings and submit to his execution, a capital defendant is not entitled to a competency evaluation and hearing to determine whether he is competent to assist in the postconviction proceedings.

{¶43} Regardless, even if we are incorrect in our determination, there is no basis to find error with the trial court's actions in this instance.  As aforementioned, in 2008 Spivey requested a competency evaluation.  The trial court granted that and stayed the proceedings for purposes of allowing Spivey to be evaluated by Dr. Gazley from the Forensic Center of Northeast Ohio.  A competency hearing was held on August 26, 2010.  Following that hearing, the trial court concluded that Spivey was competent. Therefore, since the trial court ordered a competency evaluation, stayed the proceeding until competency could be determined, and held a competency hearing, any constitutional right that may exist for a competency determination for a capital defendant during postconviction proceedings was met.  Any argument to the contrary lacks merit.

{¶44} Spivey's stated assignment indicates that the trial court erred when it found him to be competent.  However, he does not present an argument in the brief that the trial court's conclusion is not supported by the record.  Thus, without an argument to support his position, the position fails.

{¶45} That said, even if we consider their position, it is not supported by the record because it does not demonstrate that the trial court abused its discretion in finding Spivey competent.  *State v. Clark,* 71 Ohio St.3d 466, 469, 644 N.E.2d 331 (1994) (review competency determination under an abuse of discretion standard of review).  The only information in the record that is reviewable regarding what the trial court's decision was based on when it found Spivey to be competent is Dr. Gazley's report on competency and the trial court's ruling.  The transcript of the competency hearing was not filed of record.  The report indicates that Spivey is competent to proceed with the postconviction proceedings.  When asked questions about his death sentence and the appeals process, Spivey indicated that he was on death row, that death is his sentence and that an appeal could change whether he dies or not.  Dr. Gazley 06/22/10 Competency Report pg. 4.  The report also states that Spivey does

not suffer symptoms of mental illness or defect and therefore those conditions do not diminish his ability to communicate with counsel regarding the facts of the case. Dr. Gazley 06/22/10 Competency Report pg. 6. Rather, it is the passage of time and the fact that he may have been high or intoxicated at the time of the offenses that affects his communication with counsel regarding the facts of the crime. Dr. Gazley 06/22/10 Competency Report pg. 6, 8. Given that this report supports the conclusion that Spivey is competent and since there is no filed transcript of the competency hearing, we presume the regularity of that proceeding. *State v. Stewart*, 7th Dist. No. 11MA195, 2013-Ohio-753, ¶ 16 quoting *In re Sublett*, 169 Ohio St. 19, 20, 157 N.E.2d 324 (1959) ("all reasonable presumptions consistent with the record will be indulged in favor of the validity of the judgment under review and of the regularity and legality of the proceeding below"). Therefore, even if we review the competency determination it must be upheld; the record supports the conclusion that Spivey was competent. This assignment of error lacks merit.

### Conclusion

**{¶46}** For the foregoing reasons, all assignments of error lack merit. The judgment of the trial court denying the timely successive postconviction petition is hereby affirmed.

Waite, J., concurs.
DeGenaro, P.J., concurs.